FINAL – As filed and served

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND    2013 JUL -2  A 9: 36

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

---

HIGH ROCK WESTMINSTER STREET LLC,

Plaintiff,

v.

BANK OF AMERICA, N.A.,

Defendant.

---

CIVIL ACTION NO.
(Jury Trial Requested)

CA 13- 500 S

## COMPLAINT

### INTRODUCTION

111 Westminster Street ("111 Westminster" or "the Premises") is Rhode Island's tallest and most iconic skyscraper. Built in 1927, it has stood over Providence as an art deco symbol of the City's long and distinguished tradition as a regional banking center. Fleet Bank, N.A. ("Fleet"), Rhode Island's largest bank, called it home. The defendant, Bank of America, N.A. ("BOA"), one of the largest financial institutions in the world, took over as the building's sole tenant when it bought Fleet in 2004.

BOA promised it would maintain and repair 111 Westminster while it was the tenant, but instead, BOA left crumbling facades, corroded window frames and obsolete building systems. This lawsuit seeks to hold BOA to its contractual promises, and it seeks money damages to allow 111 Westminster's owner to do what BOA refused to do - maintain this Rhode Island architectural icon.

1

## PARTIES

1.  Plaintiff, High Rock Westminster Street, LLC ("High Rock") is a Massachusetts limited liability company with a principal business address at 275 Grove Street, Suite 2, Newton, Massachusetts. High Rock owns 111 Westminster.

2.  Defendant, BOA is a bank holding company with principal executive offices at Bank of America Corporate Center, 100 North Tyron Street, Charlotte, North Carolina. From April 1, 2004 through April 30, 2013, BOA was 111 Westminster's sole tenant.

3.  For all purposes in this Compliant, BOA is the successor in interest to Fleet, and assumed all of Fleet's obligations under the lease identified in paragraph 9 below, effective April 1, 2004.

## JURISDICTION AND VENUE

4.  Jurisdiction is proper in the United States District Court for the District of Rhode Island under 28 U.S. Code § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.

5.  Venue is proper in the United States District Court for the District of Rhode Island under 28 U.S. Code § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and because 111 Westminster is located within this judicial district.

## FACTS

### 111 Westminster

6.  111 Westminster was built in 1927 by Industrial Trust Company, a then rapidly-growing Rhode Island regional bank. At 428 feet, it was New England's third tallest building when built, behind only the Travelers Tower in Hartford, CT and the Customs House Tower in Boston, MA. It is designed in the classic Art Deco style and has 26 tenantable stories comprising 348,815 square feet of net rentable office space. Included in its unique architectural detail are stylized

2

floral, geometric and "sunrise" exterior friezes, interior murals, a leather-walled copper-clad penthouse room, and a prismatic glass "lantern" and signature decorative globe that top the entire structure.

7.   111 Westminster is designed as six wings off of a central tower. The building is clad in polished granite at the base floors, and a combination of Indiana limestone, glazed off-white brick, and buff-colored face brick above. The lantern incorporates large cast iron windows on each of its four faces, originally glazed in prismatic glass to create a striking beacon effect. The building's peak has traditionally been lit in bright blue light at night, changing to red and green during the Christmas season and red on Valentine's Day. For generations, it has been one of Providence's most recognizable landmarks.

8.   Industrial Trust Company was founded in May 1886. Encouraged by Rhode Island's thriving economy, the bank commissioned the prominent New York architectural firm of Walker and Gillette and local architect George Frederick Hall to build a skyscraper. The building opened in 1928, and for the next 76 years, Industrial Trust Company and then Fleet owned, and maintained their corporate headquarters at, 111 Westminster.

The Lease

9.   In 2003, Fleet entered into a real estate sale leaseback transaction pursuant to which it sold 111 Westminster to Westminster Office 1031, L.L.C. and related entities (collectively, "Westminster"), and simultaneously executed a ten-year (the "Term") lease with Westminster to continue occupying the entire building (the "Lease"). A true and correct copy of the Lease is attached as Exhibit 1.

3

10. Section 1 of the Lease, captioned *Demise*, states:

> ... *Tenant currently occupies the Premises, is familiar with the Premises, and its condition and suitability for Tenant's use* and Tenant acknowledges that Landlord has not made any warranty or representations, express or implied, as to the condition or suitability of the Premises for Tenant's intended use and the Tenant is leasing the premises in its *"AS IS"* and *"WHERE IS"* condition. *Landlord shall not have any obligation to make any repairs, alterations or improvements to the Premises either at or prior to the commencement of the term hereof or at any time thereafter.*

(Emphasis added).

11. Section 5 of the Lease, captioned *Use of Premises*, states:

> ... *Tenant shall not cause or maintain or permit any nuisance or commit or suffer the commission of any waste in, on or about the Premises.* Tenant acknowledges that landlord has made no warranty or representation regarding the suitability of the Premises for the Tenant's intended use. *Subject to the provisions of Section 6, Tenant, at its sole cost and expense, shall comply with and conform to all present and future laws, codes, ordinances..., even if unforeseen or extraordinary...* which may be applicable to Tenant, Landlord's ownership of the Premises, the Premises, or the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act..."

(Emphasis added).

12. Section 6 of the Lease, captioned *Repairs*, states:

> *Throughout the term hereof, Tenant shall keep the premises in good condition and repair and be responsible for all maintenance, repairs and replacements to the Premises, structural and nonstructural, ordinary or extraordinary, foreseen or unforeseen, including, but not limited to, all structural repairs and replacements to the foundation, exterior and/or load bearing walls, interior and exterior windows, roof, and mechanical, heating, ventilation and air conditioning systems of the premises, ...* Tenant shall make such repairs and replacements as may be necessary to keep and maintain the Premises in a condition consistent with other Class B high rise office buildings of similar age and construction located in the greater Providence, Rhode Island metropolitan area, *and shall not defer any repairs, maintenance or replacements in anticipation of the expiration of the term... Tenant shall further use all reasonable precaution to prevent deterioration, waste, damage or injury to the*

4

> **Premises.** *Landlord shall not be required to make any repairs, alterations, maintenance or replacements in or to the Premises.*

(Emphasis added).

13. Any competent building maintenance program includes a combination of predictive, preventative and reactive maintenance. No competent building maintenance program relies primarily on reactive maintenance because improperly maintained equipment fails earlier, costs more to operate, and exposes the public to potentially unsafe conditions.

14. For these reasons, Sections 5 and 6 of the Lease placed an express duty on Fleet not to "*defer any repairs, maintenance or replacements*" in anticipation of the end of the Lease, to "*use all reasonable precaution to prevent deterioration, waste, damage or injury to the Premises*", not to "*commit or suffer the commission of any waste in, on or about the Premises*", and to "*comply with and conform to all present and future laws, codes, ..., regulations and requirements, even if unforeseen or extraordinary, of every governmental authority or agency ... even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the 'Americans with Disabilities Act' ...).*"

15. Under additional provisions of the Lease, Fleet agreed to indemnify and hold Westminster and its successors and assigns harmless of and from any claims, damages, losses, liabilities and expenses (*including reasonable attorney's fees*) arising out of the breach of any covenant or agreement under the Lease (Lease, ¶ 9.4), and for any other damages sustained by Westminster and its successors and assigns as a result of any breach of Fleet's maintenance, repair and replacement obligations, *including the costs, expenses and reasonable attorney fees incurred in enforcing Fleet's maintenance, repair and replacement obligations (Lease, ¶ 14.1).*

16. On April 1, 2004, BOA bought Fleet, and thereafter took over occupancy at 111 Westminster, changed all of the signage, and assumed all of Fleet's responsibilities under the Lease.

17. Subsequent to the 2004 Fleet closing, 111 Westminster became generally known in Providence as the "*Bank of America Building*".

18. On December 21, 2007, BOA issued a signed Estoppel Letter to High Rock that confirmed the Lease was in full force and effect, that the Lease had not been amended, altered, supplemented, or otherwise modified, and that,

> *Tenant has accepted possession of the premises demised under the Lease, and Landlord has completed or provided in all respects all improvements required to be furnished by Landlord under the Lease. Subject to any audit currently underway or any future audits, to the best of Tenant's knowledge, Landlord is not in default in the performance of any of Landlord's obligations under the Lease.*

A true and correct copy of the Estoppel Letter is attached as Exhibit 2.

19. High Rock relied on the Estoppel Letter.

20. On January 24, 2008, High Rock acquired all right, title and interest in 111 Westminster, and succeeded to all of Landlord's rights under the Lease.

### Façade and Windows

21. In the summer of 2006, BOA retained Wiss, Janney, Elstner Associates, Inc. ("WJE") to perform a property condition assessment of 111 Westminster's exterior façade and windows, and to recommend appropriate maintenance, repairs and replacements consistent with the Lease obligations and good real estate management practices.

22. At the time that BOA engaged WJE, 111 Westminster's façade had begun to fail in multiple locations, and BOA was concerned that a public safety issue might exist if the condition was left untreated.

23. On December 14, 2006, WJE delivered its property condition report to BOA (the "2006 Façade Report"). A true and correct copy of the 2006 Report is attached as Exhibit 3.

24. WJE's work leading up to the 2006 Façade Report included three phases: 1.) an initial phase to familiarize WJE with the general design and construction of 111 Westminster; 2.) a second phase that included on-site investigations, including close-up inspections of the façade walls using industrial rope access techniques, and the opening of selected wall areas to observe and document concealed conditions; and 3.) a third phase that included testing of various building samples at independent laboratories.

25. The 2006 Façade Report documented extensive distress, cracking, corrosion and spalling on virtually every level and orientation of 111 Westminster's facade. WJE's findings, documented by separate photographic exhibits, ran five single-spaced pages.

26. The 2006 Façade Report prioritized the necessary repair and restoration work at 111 Westminster based on relative risk to public safety:

       a.   Immediate (emergency);

       b.   Priority 1 (within the next year);

       c.   Priority 2 (within the next two to four years);

       d.   Priority 3 (within the next five years); and

       e.   Additional Considerations (no set timetable).

27. BOA retained T. Galligan Inc. ("Galligan"), a Rhode Island commercial general contractor, to make the immediate (emergency) repairs. But BOA ignored the other 2006 Façade Report recommendations, and instead limited its repair and restoration work to only those areas for which emergency repairs needed to be done for immediate safety reasons.

28. Stated differently, BOA adopted a purely reactive façade maintenance program that did as little as possible, as late as possible, and at as low a cost as possible, including renting safety staging above street level to catch falling stone and brick, which BOA's property managers then collected in pails and stored in 111 Westminster's basement.

29. Between 2007 and 2012, WJE made annual façade inspections, continually noting that necessary repairs and replacements had not been done by BOA, contrary to WJE's repeated recommendations.

30. By way of example, WJE's August 13, 2012 Façade Inspection Report (the "2012 Façade Report") stated:

> **Limestone**
>
> ... *The following representative conditions and findings were observed ...* **Many of the conditions listed below were previously observed during the 2006, 2007, 2008, 2009, 2010 and 2011 close-up inspections and have deteriorated further:**
> ...
>                              ...
>
> **Brickwork**
>
> ... *The following conditions were observed ...* **Many of the conditions listed below were also observed during the 2006, 2007, 2008, 2009, 2010 and 2011 close-up inspections and have deteriorated further: ...**
>
>                              ...
>
> **Replacement Windows**
>
> **The conditions observed during the 2006, 2007, 2008, 2009, 2010 and 2011 inspections are consistent with those observed during the 2012 inspection. The** *perimeter sealant failure* **has continued to deteriorate with many failure locations noted**.
>
> (Emphasis added).

A true and correct copy of the 2012 Façade Report is attached as Exhibit 4.

31. Just as WJE had done in its prior annual reports, the 2012 Façade Report detailed "*excessive weathering*", "*vertical cracking*", "*units ... displaced outward*", "*lintels ... cracked*",

"*corner cracks*", "*gypsum crusts*", "*dark microbial algae growth*", "*breaches in the copper flashing*", "*alligatoring and cohesive failures*", and "*anchor and faster ... corrosion.*"

32. The 2012 Façade Report bluntly summarized the problem:

> *Other façade components and materials, which are intended to reduce water infiltration, such as sealant and mortar, are also deteriorating. As these materials deteriorate, more water will infiltrate the façade system resulting in corrosion of the unprotected carbon steel and subsequent cracking, spalling, and displacement of the limestone and brickwork.* ***Years of excessive cracking and spalling of the stone masonry units are contributing to the accelerated deterioration of the facades, especially the south façade. A permanent repair scope needs to be initiated in order to prevent the continued deterioration and potentially large-scale failures.***

> (Emphasis added).

33. But BOA never authorized funding for a permanent repair scope: not in 2006 ... or 2007 ... or 2008 ... or 2009 ... or 2010 ... or 2011 ... or 2012, despite WJE's continued warnings. Instead, BOA performed minimal repairs to the façade walls, eventually even omitting to patch spalled stonework, thus allowing additional water infiltration and accelerating the deterioration. Then BOA walked away.

34. The current estimated cost to complete necessary façade and window remediation and repair work will exceed $14,000,000.00.

35. BOA's serial maintenance, repair and replacement failures were not limited to 111 Westminster's façade and windows, however.

<u>Switch Gear, Panelboards, Transformers and Busducts</u>

36. In August 2000, C.B. Richard Ellis ("CBRE"), Fleet's property manager, was advised in a report captioned, "Main Circuit Breaker Replacement Study" (the "2000 Main Breaker Study"), that the main circuit breakers in the basement of 111 Westminster were obsolete and required replacement to avoid a potentially extended and "chaotic" power outages. A true and correct copy of the 2000 Main Breaker Study is attached as Exhibit 5.

37. Circuit breakers, also referred to as switchgear, are used to control, protect and isolate electrical equipment by de-energizing equipment and clearing downstream electrical faults.

38. Because Fleet knew that the main basement switchgear required replacement even before the Lease commenced, it agreed in Section 6 of the Lease that:

> Tenant, at its sole cost, shall replace the existing main electrical switchgear ("Switch Gear") in the basement of the building located at the Premises, provided that if at the end of the term Tenant has not replaced the Switch Gear and has not exercised its right pursuant to Section 2.2 to extend the term of this Lease, the Tenant shall pay the sum of $120,000 to Landlord.

39. Fleet did not replace the basement main switch gear.

40. BOA did not replace the basement main switch gear.

41. BOA did not extend the Term.

42. BOA failed to pay High Rock $120,000.00 pursuant to Section 6.

43. Instead, BOA replaced the cover on the basement main circuit breaker box, giving the false impression that the circuit breakers themselves had been replaced.

44. In June 2004, CBRE received a replacement study prepared by Johnson & Stover, Inc. and Ekman & Arp Architects concerning the four 1000 kVA electrical transformers on the third floor roof (the "2004 Transformer Study"). Those transformers fed a second floor switchboard, and from there, individual panelboards on each floor. A true and correct copy of the 2004 Transformer Study is attached as Exhibit 6.

45. The 2004 Transformer Study concluded,

> The existing transformer primary feeders **do not now meet present electrical codes**. The three (3) 1000kVA transformers are approximately 46 years old **and have far exceeded their useful life**...
>                    ...
> The study was initiated due to the concern on the part of [CBRE] that **the existing ... transformers are old and have greatly exceeded their useful life** and their replacement under **an emergency failure would be chaotic**, costly and result in

*significant down time for portions of the building affected by the failed transformer...*

(Emphasis added).

46. The 2004 Transformer Study was equally blunt with respect to the building electrical distribution system:

> a. *There is a 2000 amp and a 2500 amp main service circuit breaker (manufactured by ITE in 1945... The reliability and availability of parts for these breakers being nearly 60 years old is very suspect and **they should be replaced**...*
>
> b. *The primary overcurrent protection serving the 480 volt – 120/280 volt, 1000kVA dry type transformers **do not meet present code**.*
> ...
> e. *... There is evidence that the enclosures to the busducts are **deteriorating due to the environment and pigeons feces**...*

(Emphasis added).

47. Both the 480v basement transformers and the 1000kVA third floor transformers were obsolete well in advance of the Termination Date.

48. Transformers are not switch gear for purposes of Section 6 of the Lease.

49. The third floor switch boards terminate and deliver power to tenant floors with circuit breakers dating to 1952. The typical life expectancy of a circuit breaker is twenty years. The equipment was beyond its expected life cycle and should have been replaced by BOA well before the end of the Term.

50. Floors SD, 2-5, 8-9, 17-18 and 22-25 all have original electrical panelboards servicing the floors. The circuit breakers in the panelboards are beyond their expected life cycle and should have been replaced by BOA well before the end of the Term.

51. The motor control center in the third floor mechanical penthouse is the original motor control center and motor control starters have a life expectancy of thirty years. The third floor

motor control center is beyond its expected life cycle and should have been replaced by BOA
well before the end of the Term.

52. After BOA acquired Fleet and took over occupancy, BOA knew that 111 Westminster's
transformers, switch gear, panelboards, busducts and motor controls were outdated and should be
replaced, and that a failure of those systems could be chaotic, costly and result in significant
down time for 111 Westminster's electrical systems.

53. In November 2010, BOA received a $4.5 million budget estimate from an independent
construction consultant to replace all of the obsolete electrical supply and distribution equipment
at 111 Westminster (the "2010 Electrical Replacement Budget"). A true and correct copy of the
2010 Electrical Replacement Budget is attached as Exhibit 7.

54. As with the façade, BOA ignored its own consultants' advice and allowed obsolete and
potentially unsafe electrical equipment to remain in place, despite the possibility of a
catastrophic and chaotic failure of 111 Westminster's electrical systems.

55. BOA's willful refusal to replace obsolete and unsafe electrical transformers, switch gear
and related electrical distribution systems was made in bad faith, and knowingly exposed all of
111 Westminster's occupants to potentially unsafe conditions.

56. The current estimated cost to replace 111 Westminster's obsolete building electrical
systems will exceed $4,000,000.00.

57. BOA's serial maintenance, repair and replacement failures were not limited to 111
Westminster's façade, windows, transformers, switch gear, panelboards, electrical distribution
systems, and motor controls, however.

12

### HVAC Systems and Controllers

58. With the exception of the 17th floor, 111 Westminster's heat is provided by two #6 fuel oil-fired steam boilers that are over 85 years old. The boilers were built by George Allen & Son, a defunct company, and replacement parts are no longer available.

59. The boilers are beyond their expected life cycle, have energy efficiencies well below industry norm, and should have been replaced by BOA well before the end of the Term.

60. Cooled water feeding air handlers on floors 1 through 5 is provided by a centrifugal water chiller located on the fourth floor of 111 Westminster. The fourth floor chiller is over 30 years old.

61. Centrifugal chillers of the type found on the fourth floor at 111 Westminster have an estimated useful life of 23 years. 111 Westminster's fourth floor centrifugal water chiller is beyond its expected life cycle, and should have been replaced by BOA well before the end of the Term.

62. The sixth through twenty-sixth floors at 111 Westminster are cooled by fifty-seven split-system DX air cooled air handlers which have an estimated useful life of 15 years. Thirty-one of the fifty-seven split-system DX coolers at 111 Westminster are 15 years old or older, are beyond their expected life cycle, and should have been replaced by BOA well before the end of the Term.

63. There are eight self-contained DX air handlers at 111 Westminster, all of which have an estimated useful life of 15 years, and all of which were 18 years old, are beyond their expected life cycle, and should have been replaced by BOA well before the end of the Term.

64. Upon information and belief, 111 Westminster used an energy management system manufactured by Novar, a Honeywell subsidiary that is a market leader in the control and management of large building multi-unit HVAC systems.

13

65. Upon information and belief, BOA removed the front-end Novar energy management controls from 111 Westminster at the end of the Term, leaving remote controllers on various floors, with no ability to control the remote controllers.

66. BOA never told High Rock that it intended to remove Novar system components from 111 Westminster, and High Rock never gave BOA permission to remove any or building energy management system components at the end of the Term.

67. The current estimated cost to replace the obsolete boilers and the obsolete or missing HVAC systems and components will exceed $2,500,000.00.

68. BOA's serial maintenance, repair and replacement failures were not limited to 111 Westminster's façade, windows, transformers, switch gear, panelboards, electrical distribution systems, motor controls, and HVAC systems and controllers, however.

<u>Fire Protection Systems</u>

69. The main bank lobby area at 111 Westminster has no sprinkler protection.

70. The vault area in the basement of 111 Westminster has no sprinkler protection.

71. The third floor pump house / chiller house at 111 Westminster has no sprinkler protection.

72. Each of the above areas at 111 Westminster should have had sprinkler protection installed during the Term.

73. The electrical generator room at 111 Westminster has a wet sprinkler system despite being exposed to incoming fresh air during the winter months which could reasonably be expected to be below 40 degrees on a regular basis.

74. Based on projected winter temperatures, the electrical generator room at 111 Westminster should have had a dry sprinkler system installed.

75. Numerous sidewall sprinkler heads installed throughout 111 Westminster use aftermarket protective guards that are not listed for use with the sprinkler heads.

76. All of the above conditions were known to BOA during the Term and should have been remediated well before the end of the Term.

77. The current estimated cost to install the missing sprinklers and code-compliant sprinkler head protective guards will exceed $80,000.00.

78. BOA's serial maintenance, repair and replacement failures were not limited to 111 Westminster's façade, windows, transformers, switch gear, panelboards, electrical distribution systems, motor controls, HVAC components, systems and controllers, and fire protection, however.

### ADA Compliance

79. The Americans with Disabilities Act Accessibility Guidelines (the "ADA Guidelines") set forth the accessibility requirements applicable to all public accommodation and commercial spaces.

80. The ADA Guidelines contain provisions setting forth the minimum accessibility standards for, *inter alia*, parking lots, bathrooms and lobbies.

81. The Rhode Island State Building Code (the "SBC") includes analogous accessibility requirements to those contained in the ADA Guidelines.

82. 111 Westminster is subject to both the ADA Guidelines and the SBC.

83. Restrooms on floors 2, 4-5, 7-8, 10, 14, 16-17 and 19 -27 fail to meet minimum accessibility standards under the ADA Guidelines and the SBC.

84. BOA's failure to renovate and retrofit publicly accessible spaces within 111 Westminster during the Term constituted separate breaches of the Lease.

85. The current estimated cost to make 111 Westminster compliant with the ADA Guidelines and the SBC will exceed $700,000.00.

## COUNT I
### (Breach of Contract – Basement Switch Gear)

86. High Rock repeats the allegations set forth in paragraphs 1 though 85 as though fully set forth herein.

87. In connection with its purchase of 111 Westminster, High Rock succeeded to all rights as Landlord under the Lease.

88. BOA acknowledged High Rock's rights from and after January 24, 2008.

89. BOA acknowledged its obligations under the Lease to High Rock from and after January 24, 2008.

90. High Rock performed all of its material obligations under the Lease through the Term.

91. Subject to High Rock's hold-over tenancy claims set forth in Count V below, the Lease expired on April 30, 2013.

92. Prior to the end of the Term, BOA failed to replace the basement main switch gear.

93. BOA owes High Rock not less than $120,000.00 under the basement main switch gear provision of Section 6 of the Lease.

94. High Rock suffered damages as a direct and proximate result of BOA's breach of the basement main switch gear payment provisions of the Lease.

## COUNT II
### (Breach of Contract – Maintenance, Repair and Replacement)

95. High Rock repeats the allegations set forth in paragraphs 1 though 94 as though fully set forth herein.

96. Prior to the end of the Term, BOA failed to perform its additional contractual obligations under the Lease to repair, maintain and replace under Sections 5 and 6 of the Lease.

97. Prior to the end of the Term, BOA willfully, recklessly and continuously breached its contractual obligations by knowingly allowing obsolete and unsafe equipment and conditions on the Premises.

98. BOA was repeatedly informed during the Term by both third party consultants and its own property managers that obsolete and unsafe equipment and conditions existed on the Premises.

99. Not later than November 2009, BOA received a $21,770,601.00 estimate to perform necessary renovations at 111 Westminster (the "2009 Renovation Estimate"). A true and correct copy of the 2009 Renovation Estimate is attached as Exhibit 8.

100. BOA ignored the 2009 Renovation Estimate, and instead continued to allow waste, and permitted obsolete and unsafe equipment and conditions to continue in operation at 111 Westminster.

101. BOA's acts, actions, and conduct, and its failures and omissions to act, were in bad faith and with willful indifference to the continuing deterioration and damage to 111 Westminster occasioned by such breaches.

102. BOA willfully concealed its contractual breaches from High Rock.

103. The current estimated cost to repair, maintain and/or replace 111 Westminster's façade, internal areas, components and building systems will now exceed $23,000,000.00.

104. High Rock suffered damages as a direct and proximate result of BOA's breach of its leasehold obligations.

17

## COUNT III
### (Implied Covenant of Good Faith and Fair Dealing)

105. High Rock repeats the allegations set forth in paragraphs 1 though 104 as though fully set forth herein.

106. The Lease contained an implied covenant of good faith and fair dealing.

107. The Lease included as an essential element certain covenants intended to preserve and protect 111 Westminster from damage, decay and waste.

108. BOA engaged in arbitrary and unreasonable acts and omissions that prevented High Rock from receiving the contractual objective of maintaining, preserving and protecting 111 Westminster during the Term.

109. High Rock suffered damages as a direct and proximate result of BOA's multiple breaches of the implied covenant of good faith and fair dealing during the Term.

## COUNT IV
### (Waste)

110. High Rock repeats the allegations set forth in paragraphs 1 though 109 as though fully set forth herein.

111. At all times during the Term, BOA or Fleet, its predecessor in interest, were the sole tenants at 111 Westminster.

112. BOA covenanted and agreed in the Lease not to cause, maintain or permit any nuisance, or commit or suffer the commission of any waste in, on or about the Premises.

113. On multiple occasions during the Term, BOA engaged in acts, actions and conduct which caused lasting damage to 111 Westminster, or alternatively, failed, neglected or omitted to act to prevent lasting damage to 111 Westminster.

18

114.  By virtue of its acts, actions, and conduct, and its failures and omissions to act, BOA committed waste upon, and caused lasting damage to, 111 Westminster.

115.  BOA's acts, actions, and conduct, and its failures and omissions to act, were willful, reckless and in bad faith.

116.  High Rock has suffered damages as a direct and proximate result of BOA's acts, actions, and conduct, and its failures and omissions to act.

## COUNT V
(Hold-Over Tenancy)

117.  High Rock repeats the allegations set forth in paragraphs 1 though 116 as though fully set forth herein.

118.  Pursuant to Section 18 of the Lease, all alterations and decorations made to 111 Westminster by Fleet or BOA during the Term became High Rock's property, while BOA expressly retained title to all furnishings, trade fixtures, equipment and other personal property, with a right to remove the same not later than the end of the Term.

119.  Upon information and belief, in late 2012, BOA secured not less than two separate quotes to remove its furnishings, trade fixtures, equipment and other personal property from the Premises at the conclusion of the Term.

120.  Rather than doing so, BOA instead removed only the most valuable furnishings, fixtures and equipment, leaving behind thousands of file cabinets, desks, cubicles and other miscellaneous office furnishings and equipment, most of which was damaged, and all of which has little or no value.

121.  In fact, BOA physically removed every desk and file cabinet drawer on multiple floors at 111 Westminster, leaving them in piles, and rendering the furniture and equipment worthless.

122.  High Rock's movers have estimated that BOA's personal property left behind at 111 Westminster will fill approximately 76 full-sized tractor trailer boxes.

123.  At no time did High Rock give BOA permission to leave any of its personal property at 111 Westminster beyond the end of the Term.

124.  Pursuant to Section 20 of the Lease, BOA is liable to pay rent to High Rock as a hold-over tenant because it remains in possession of 111 Westminster by virtue of leaving approximately 76 tractor trailer boxes worth of personal property at the end of the Term.

125.  Pursuant to Section 20 of the Lease, BOA's contractual hold-over rent is $239,810.31 per month, computed on a daily basis, plus taxes, assessments, insurance, utilities, and other tenant charges imposed under the Lease, for so long as BOA's personal property remains at 111 Westminster.

126.  High Rock has made written demand on BOA to remove its personal property, but BOA has refused to do so.

127.  High Rock has suffered, and will continue to suffer, damages as a direct and proximate result of BOA's failure to remove its personal property from 111 Westminster at the end of the Lease.

## COUNT VI
### (Lost Rental Income)

128.   High Rock repeats the allegations set forth in paragraphs 1 though 128 as though fully set forth herein.

129.  BOA's acts, actions, and conduct, and its failures and omissions to act, have rendered 111 Westminster unrentable until such time as the façade, electrical, ADA and certain of the HVAC repair and replacement work has been completed.

130. 111 Westminster cannot complete the necessary façade, electrical, ADA and HVAC repair and replacement work until such time as the necessary funds are in hand.

131. 111 Westminster cannot finance the necessary repairs and replacements without a major tenant in place, and a major tenant cannot be solicited until such time as the necessary repairs and replacements are completed.

132. Accordingly, 111 Westminster has suffered and will continue to suffer damages in the form of lost rents.

WHEREFORE, High Rock Westminster Street LLC respectfully requests that the Court enter the following Judgment in its favor:

a) A finding that Bank of America, N.A. breached its express and implied contractual obligations under the Lease;

b) A finding that such breaches were willful, reckless and with conscious indifference to the damage caused to 111 Westminster;

c) An award of damages to High Rock Westminster Street LLC under Count I in an amount not less than $120,000.00;

d) An award of damages to High Rock Westminster Street LLC under Counts II and III in an amount not less than $23,000,000.00;

e) A finding that Bank of America, N.A. acted willfully, with malice and in bad faith by permitting potentially unsafe conditions to continue at 111 Westminster during the Term;

f) An award of punitive damages to High Rock Westminster Street LLC in excess of the amount awarded under Prayer d) in an amount to be determined at trial;

g) A finding that  Bank of America, N.A. caused waste under Count IV  in an amount to be determined at trial;

h)  An award of double damages under Rhode Island General Laws 34-14-1 to High Rock Westminster Street LLC for all damages awarded under Prayer g);

i) An award of damages to High Rock Westminster Street LLC in the amount of $239,810.31 per month plus taxes, assessments, insurance, utilities, and other related tenant charges under the Lease, computed on a daily basis, for so long as Bank of America, N.A. fails to remove all of its personal property from 111 Westminster;

21

j) An award of damages to High Rock Westminster Street LLC in the amount not less than $300,000.00 to pay for the cost of removing and disposing of all Bank of America, N.A. personalty from 111 Westminster;

k) An award of damages to High Rock Westminster Street LLC in an amount equal to the fair rental value of 111 Westminster from the later of either the end of the Term or the Hold-Over Tenancy, and continuing thereafter until the repairs and replacements referenced in Count VI have been completed;

l) An award of pre-judgment interest at the statutory rate to High Rock Westminster Street LLC through the date of entry of Judgment;

m) An award of all attorneys' fees, taxable costs and expenses incurred by High Rock Westminster Street LLC in enforcing its rights under the Lease; and

n) An award of such other and additional relief to High Rock Westminster Street LLC as the Court deems reasonable and appropriate under the circumstances.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

HIGH ROCK WESTMINSTER
STREET LLC
By its attorneys,

Stephen J. Reid, Jr. (RI #2811)
BLISH & CAVANAGH LLP
Commerce Center
30 Exchange Terrace
Providence, RI 02903-1765
T: (401) 831-8900
F: (401) 751-7542
sjr@blishcavlaw.com

-and-

Daniel J. Lyne (MA #309290)
Shawn Lu (MA #679755)
Michael K. O'Neil (MA #685205)
MURPHY & KING, P.C.
One Beacon Street
Boston, MA 02108
T: (617) 423-0400
F: (617) 423-0498
djl@murphyking.com
sl@murphyking.com
mko@murphyking.com

Dated: July 2, 2013