UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                )
HIGH ROCK WESTMINSTER STREET LLC, )
                                )
        Plaintiff,              )
                                )
        v.                      )    C.A. No. 13-500 S
                                )
BANK OF AMERICA, N.A.,          )
                                )
        Defendant.              )
_____)


### MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

        Before the Court are Bank of America, N.A.'s ("BOA" or the "Bank") Motion for Summary Judgment ("Motion for Summary Judgment" or "BOA's Motion") (ECF No. 205) and High Rock Westminster Street LLC's ("High Rock") Motion to Amend the Complaint ("Motion to Amend" or "High Rock's Motion") (ECF No. 257).  For the reasons set forth below, BOA's Motion is GRANTED IN PART and DENIED IN PART; High Rock's Motion is DENIED.

I.  Background

        This dispute centers on BOA's obligations under a ten-year, so-called "triple net" lease (the "Lease") between BOA and High Rock[1] for the building at 111 Westminster Street in Providence,

_____

        [1]  Subsequent to the lease, on April 1, 2004, BOA acquired Fleet National Bank (the original lessee of the Building), took over occupancy of the Building, and assumed Fleet's

Rhode Island (the "Building" or "Premises").[2]   The interaction between the Lease's Repair and Termination Provisions form the core of the parties' dispute.   Under the Lease's Repair Provision, BOA agreed to

> keep the Premises in good condition and repair and be responsible for all maintenance, repairs and replacements to the Premises, structural and nonstructural, ordinary or extraordinary, foreseen or unforeseen, including, but not limited to, all structural repairs and replacements to the foundation, exterior and/or load bearing walls, interior and exterior windows, roof, and mechanical, heating, ventilation and air conditioning systems of the Premises . . . .

(Lease § 6, Ex. H to BOA's Statement of Undisputed Material Facts ("SUF"), ECF No. 207-8.)   The provision goes on to specify that BOA would

> make all such repairs and replacements as may be necessary to keep and   maintain the Premises in a condition consistent with other Class B high rise office buildings of similar age and construction located in the greater Providence, Rhode Island metropolitan area, and shall not defer any repairs, maintenance or replacements in anticipation of the expiration of the term.

(Id.)   BOA also agreed that

---

responsibilities under the Lease.   Four years later, on January 24, 2008, High Rock bought the Building and took over the prior owner's rights and responsibilities under the Lease.   For consistency and to avoid confusion, the Court will refer to Fleet and BOA as "BOA," and High Rock and its predecessor in interest as "High Rock."

[2]   The Building is often referred to as the "Superman Building" because of its resemblance to the Daily Planet building in Superman.

> [n]otwithstanding the foregoing, (a) [BOA], at its
> sole cost, shall replace the existing main electrical
> switch gear ("Switch Gear") in the basement of the
> building located at the Premises, provided that if at
> the end of the term [BOA] has not replaced the Switch
> Gear and has not exercised its right pursuant to
> Section 2.2 to extend the term of the this Lease, then
> [BOA] shall pay the sum of $120,000.00 to [High Rock]
> . . . .

(Id.)  And the Repair Provision concludes by requiring BOA to

> keep the heating, ventilating and air conditioning,
> plumbing, electrical and other mechanical systems in
> good operating condition . . . [,] make any repairs,
> replacements or improvements which may be required by
> any laws, rules, regulations, ordinances or orders of
> any federal, state, local, or other governmental
> authority . . . [,] [and] use all reasonable
> precaution to prevent deterioration, waste, damage or
> injury to the Premises.

(Id.)  In a separate provision, BOA also agreed to indemnify

High Rock for costs, damages, and expenses of certain types of

asbestos in the Building.  (See id. § 27.)

As detailed below, the parties hotly dispute how these

maintenance and repair requirements interact with the Lease's

Termination Provision.  There, BOA agreed to

> surrender the Premises to [High Rock] in as good
> condition and repair as when the Lease commenced,
> excepting ordinary wear and tear, condemnation, damage
> from any cause not required to be repaired or replaced
> by [BOA] . . . .

(Id. § 18.)  BOA also agreed that

> [a]ll movable furnishings, trade fixtures and other
> equipment and personal property owned by [BOA] may be
> removed from the Premises by [BOA], at [BOA]'s sole
> expense, no later than the date of termination . . . .

(Id.)

In 2013, BOA decided not to renew the Lease and vacated the Building. Shortly thereafter, High Rock commenced the present suit. According to High Rock, BOA (1) failed to meet its maintenance and repair obligations for a number of the Building's components including its façade, electrical distribution system, and heating and cooling systems ("HVAC" systems) (Counts I and II); (2) breached the Lease's implied covenant of good faith and fair dealing and committed waste when it failed to properly maintain the Building (Counts III and IV); (3) left so much furniture in the Building that BOA was effectively a holdover tenant liable for rental payments (Count V); and (4) that as a result of BOA's maintenance failures, BOA has caused High Rock to lose rental income for the Building (Count VI).[3]  (See Compl., ECF No. 1.)  High Rock also moves to amend its Complaint to add allegations that BOA failed to remove asbestos as required under the Lease.  (See Pl.'s Mot. to Am., ECF No. 257.)

---

[3]  In its Complaint, High Rock also alleges BOA failed to adequately maintain the Building's fire protection system, and failed to make the Building's bathrooms ADA compliant.  At oral argument on BOA's Motion, High Rock conceded that it was abandoning these claims.  (Summ. J. Hr'g Tr. 3:1-15, ECF No. 251.)

BOA now seeks summary judgment on five of High Rock's six claims and opposes High Rock's Motion to Amend.[4]   BOA first argues that it satisfied the Lease's maintenance and repair provisions because it returned the Building in the same condition as when it started the Lease in 2003.  BOA then argues that High Rock's remaining claims fail as a matter of law and, that in any event, High Rock's damages are too speculative to afford it any relief.  BOA also opposes High Rock's Motion, arguing that High Rock has not presented any justification for its long delay in attempting to add the asbestos claim.

## II. Legal Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is only considered "'genuine' if it 'may reasonably be resolved in favor of either party.'" Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  When deciding a motion for summary judgment, the court must "examine[] the entire record 'in the light most

---

[4]    BOA concedes that High Rock is entitled to summary judgment on Count I.  There, High Rock alleges BOA breached the Lease's express provision that BOA would replace the Building's main switch gear during the Lease term.  The Lease provided liquidated damages for such a breach:  $120,000.  BOA admits that it is liable for these damages.  (BOA's Mem. 18 n.18, ECF No. 205-1.)

flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor.'" <u>Id.</u> at 959 (quoting <u>Maldonado-Denis</u>, 23 F.3d at 581).

Under Federal Rule of Civil Procedure 15(a), a party may amend its complaint once as a matter of course within 21 days of serving it or 21 days after the service of a responsive pleading. When this one-time right to amend is exhausted, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). And, while under Rule 15, courts should "freely give leave" to amend "when justice so requires," this dictate is not without limits. <u>Id.</u> Even under Rule 15's "amendment-friendly regime," <u>U.S. ex rel. D'Agostino v. EV3, Inc.</u>, 802 F.3d 188, 192 (1st Cir. 2015), courts can "deny leave to amend when the request is characterized by 'undue delay, bad faith, futility, [or] the absence of due diligence on the movant's part.'" <u>Nikitine v. Wilmington Trust Co.</u>, 715 F.3d 388, 390 (1st Cir. 2013) (quoting <u>Palmer v. Champion Mortg.</u>, 465 F.3d 24, 30 (1st Cir. 2006)). Indeed, this Court's Local Rules specify that "[a]ny motion to amend a pleading <u>shall</u> be made promptly after the party seeking to amend first learns the facts that form the basis for the proposed amendment." D.R.I. LR Cv 15 (emphasis added).

III. Discussion

    A.  High Rock's Breach of Contract Claims

    The parties largely agree on the principles of contract interpretation the Court should employ to determine BOA's maintenance and repair obligations under the Lease. Generally, "[i]f a contract is clear and unambiguous, the meaning of its terms presents a question of law for the court." Rotelli v. Catanzaro, 686 A.2d 91, 94 (R.I. 1996) (citing Hodor v. United Servs. Auto. Ass'n, 637 A.2d 357, 359 (R.I. 1994)). And "whether the terms of a contract are clear and unambiguous is itself a question of law, and the court may consider all the evidence properly before it in reaching its conclusion." Id. (citing Westinghouse Broad. Co. v. Dial Media, Inc., 410 A.2d 986, 991 (R.I. 1980)).

    To determine if a contract is unambiguous, the court must review the document "in its entirety and [give] its language . . . its plain, ordinary and usual meaning." Paradis v. Greater Providence Deposit Corp., 651 A.2d 738, 741 (R.I. 1994). This means that the court must give every word of the contract "meaning and effect; an interpretation that reduces certain words to the status of surplusage should be rejected." IDC Prop., Inc. v. Chicago Title Ins. Co., 974 F. Supp. 2d 87, 99 (D.R.I. 2013) (quoting Andrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004)). But where a contract sets forth both

7

general and specific provisions, the more specific provisions control. See Sch. Comm. of Town of N. Kingstown v. Crouch, 808 A.2d 1074, 1079 (R.I. 2002) (applying the rule that specific terms in a contract limit general terms); Elliot Leases Cars, Inc. v. Quigley, 373 A.2d 810, 813 (R.I. 1977) (same); see also Kolbe v. BAC Home Loans Servicing, L.P., 738 F.3d 432, 445 n.13 (1st Cir. 2013); Restatement (Second) of Contracts § 203(c) (noting that "specific terms and exact terms are given greater weight than general language").[5]

### 1. Defining "Good Condition and Repair"

Guided by these principles, the first question the Court must answer is what constitutes "good condition and repair" under the Lease. This phrase sets the baseline for BOA's maintenance and repair obligations, and the parties strongly disagree over how the phrase should be defined here.

Citing Principal Mutual Life Insurance Co. v. Racal-Datacom, Inc., 233 F.3d 1 (1st Cir. 2000), a First Circuit opinion interpreting Massachusetts law, BOA argues that the

---

[5]    As Comment (e) to Section 203 of the Restatement explained, "[a]ttention and understanding are likely to be in better focus when language is specific or exact, and in case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language." Restatement (Second) of Contracts § 203 cmt. (e).   And, particularly relevant to this action, the Comment goes on to explain that "[i]f the specific or exact can be read as . . . [a] qualification of the general, both are given some effect, in accordance with the rule stated in Subsection (a) [of Section 203]." Id.

phrase means "in the same condition it was in as of 2003, excepting ordinary wear and tear." (Def.'s Mem. 21-23, ECF No. 205-1.) According to BOA, this sets the Building's 2003 condition as its baseline and the Bank only had to keep it in that same condition over the course of the Lease. High Rock disagrees. Relying on the Rhode Island Supreme Court's decision in Miller v. McCardell, 33 A. 445 (1895), it asserts that, under Rhode Island law, the phrase required BOA to maintain the building in good condition, which, if necessary, meant restoring the Building to that condition before the end of the lease. (Pl.'s Opp'n 27-28, ECF No. 228.)

Despite the parties' arguments, neither Principal nor Miller control the definition of "good condition and repair" in this case. Both considered leases that did not define the phrase "good condition and repair." Consequently, the courts in both Principal and Miller needed to do so.[6] Here, by contrast, the Lease provides the definition of "good condition and

---

[6] In Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 2 (1st Cir. 2000), the court considered the scope of a commercial lease's requirement to return property "in good condition" at the end of the lease. Applying Massachusetts law, the court held that "unless the lease indicates otherwise, good or tenantable condition means as of the start of the lease." Id. at 5 (emphasis added). Here, assuming that Rhode Island courts would even follow Principal, the Lease does "indicate otherwise." Similarly, Miller v. McCardell, 33 A. 445, 446 (1895) considered a lease that only contained a general "good condition" provision. Unlike here, the lease did not include more specific standards to which a tenant had to maintain a building.

repair." Although the Repair Provision does not expressly define the phrase, the Termination Provision does. It clearly states that BOA was required to "surrender the Premises to Landlord in as good condition and repair as when the Lease commenced, excepting ordinary wear and tear." (Lease § 18, Ex. H to BOA's SUF, ECF No. 207-8.) This language provides a specific and unambiguous baseline for BOA's maintenance and repair obligations: BOA had to maintain and return the Building to High Rock in as good a condition as it was in in 2003, excepting ordinary wear and tear. Under the rules of construction cited above, this specific provision controls.

2. BOA's Maintenance and Repair Obligations

This brings the Court to the second issue it must resolve – whether questions of fact exist regarding BOA's discharge of its maintenance and repair obligations. BOA principally argues that it is entitled to summary judgment because High Rock has not presented any evidence of the Building's condition in 2003. Consequently, according to BOA, High Rock cannot demonstrate that the Building's façade, electrical, and HVAC systems were in worse condition, except for ordinary wear and tear, when BOA surrendered the Building to High Rock in 2013. With this argument, BOA overplays its hand.

i.   Class B Office Space

For starters, under the express terms of the Lease, BOA was obligated to "make all such repairs and replacements as may be necessary to keep and maintain the Premises in a condition consistent with other Class B high rise office buildings of similar age and construction located in the greater Providence, Rhode Island metropolitan area."  (Id. § 6.)  The parties do not dispute that the Building had a Class B rating when the Lease commenced.  Consequently, in order to return the Building in "as good condition and repair as when the Lease commenced," BOA had an affirmative duty to make "repairs and replacements" necessary to maintain the Building's Class B classification and to return the Building to High Rock in a condition warranting a Class B rating.

BOA tries to lessen this obligation by arguing that the Lease only required it to maintain the Building in Class B condition by 2003 standards, not one warranting such a rating in 2013.  This argument is without merit.  The Lease is clear - BOA agreed to make "repairs and replacements" necessary to tender the Building to High Rock in Class B condition, not in 2003 Class B condition.  That BOA agreed to surrender the Building to High Rock in "as good condition and repair as when the Lease commenced" does not change this fact.  It merely means that BOA did not have to upgrade the Building to a Class A building, but

11

it could also not allow the Building to slip into the condition of a Class C or D building.  It had to do enough maintenance to preserve the Building's Class B rating.  And questions of fact exist as to whether BOA met this obligation.

The parties agree that experts must (1) define the phrase "Class B office space," and (2) opine as to whether BOA's maintenance efforts met this definition.  To this end, they have submitted competing expert opinions on both points, creating what amounts to a classic battle of the experts.  To overcome the questions of fact inherent in this battle, BOA attacks High Rock's expert, Peter M. Scotti, a longtime certified appraiser in Providence.  According to BOA, the Court should strike his opinions because Scotti (1) did not identify whether he undertook any effort to determine the condition of the Building in 2013; (2) did not identify the methodology he applied in arriving at his conclusion; and (3) failed to carry out a meaningful investigation into BOA's efforts to maintain the Building.  (Def.'s Mot. to Strike High Rock's Expert Disclosures 9-10, ECF No. 214-1.)

Only one of BOA's arguments warrants discussion:  Scotti's admission that his report is silent on his efforts to determine the condition of the Building in 2013.[7]  BOA argues that this

_____

[7]  Based on the record before the Court, Scotti identified his methodology and carried out an investigation into BOA's

12

demonstrates Scotti did not determine whether the Building was in Class B condition when BOA tendered the Building to High Rock, a key component of High Rock's Class B argument. BOA, however, misstates Scotti's testimony.

First, Scotti's expert report expressly states that he relied on information he gathered in 2012, prior to the end of the Lease. (See Scotti Rep. ¶¶ 11 & 36, Ex. C to Def.'s Mot. to Strike, ECF No. 215-3.) Scotti also testified that he walked through the Building in conjunction with his work for High Rock as early as October 22, 2013, only a few months after BOA vacated the Building. (Scotti Dep. Tr 19:1-18, Ex. D to Def.'s Mot. to Strike, ECF No. 215-4.) And Scotti considered other evidence of the Building's condition over the course of the Lease. For example, during his inspections, he spoke extensively with Paul Almeida, an individual who had worked in the Building for twenty years about, among other things, upgrades the Bank had made to the Building (id. at 23:15-22; 29:23-30:10), and considered a number of BOA's building

---

efforts to maintain the Building. For his methodology, Scotti relied on the standards set forth by 111 Westminster Owners and Managers Association ("BOMA"), a purportedly well-known real estate industry group, to compare the Building's condition with that of other comparable buildings in Providence. (See Scotti Rep. ¶¶ 13-26, Ex. C to Def.'s Mot. to Strike, ECF No. 215-3.) And, as detailed below, his investigation consisted of a number of inspections of the Building – before and after BOA vacated it – interviews with former property managers, a review of building reports, and reviews of other properties in Providence.

inspection reports (id. at 13:14-20; Scotti Rep. ¶ 31, Ex. C to Def.'s Mot. to Strike, ECF No. 215-3).  Based on the information gathered from these efforts, Scotti opined that the Building's façade, electrical, and HVAC systems were not consistent with Class B condition.  (Scotti Rep. ¶ 37, Ex. C to Def.'s Mot. to Strike, ECF No. 215-3.)  And Scotti noted that "[a]ll of the building conditions described in [his] report were present when [he] inspected [the Building] in connection with preparing [his] 2012 appraisal report."  (Id. ¶ 36.)  While BOA vehemently disagrees with Scotti's opinions, the evidence does not support BOA's contention that Scotti failed to consider the condition of the building at or near the time BOA tendered it to High Rock in 2013.

BOA also takes issue with Scotti's opinion because it contradicts other appraisals conducted during and after the Lease's term.  BOA principally relies on its own expert, Darian L. Buchalter, who strongly disagreed with Scotti's techniques and conclusions.  And BOA points to a number of other appraisals conducted during the course of the Lease that classified the Building as Class B office space.  These competing opinions merely demonstrate the existence of a question of fact as to whether BOA maintained and delivered the Building as Class B office space.  At trial, they would certainly be fodder for BOA's argument that Scotti's testimony should not be given much

14

weight by the jury, but they do not render Scotti's opinions inadmissible and unworthy of consideration at summary judgment.[8]

All of this is to say that questions of fact abound as to whether BOA maintained and tendered the Building to High Rock in Class B condition. Consequently, this issue will go to a jury.

ii. Façade, Electrical, and HVAC Systems

BOA also argues that High Rock's breach of contract claim fails as to the façade, electrical, and HVAC systems because High Rock has not presented any evidence that they were in worse condition in 2013, when the Lease ended, than in 2003, when the Lease began. With this argument, BOA again understates its Lease obligations. In addition to its general obligation to maintain the Building "in good condition and repair," BOA had to

---

[8] The Court pauses to clarify the scope of its holding on Scotti's expert opinion. As the parties are aware, under the regime first set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), district courts perform a gatekeeping function to gauge the reliability and relevance of potential expert testimony. See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 188-89 (1st Cir. 1997). While Daubert is "accessible" to district courts at summary judgment, "given the complex factual inquiry required by Daubert, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated [summary judgment] record." Id. at 188. Here, based on the record currently before the Court, High Rock has presented enough evidence to survive summary judgment. But the Court expressly reserves its ruling on the scope of Scotti's testimony and admissibility of his various opinions at trial until after a pre-trial Daubert hearing. As the First Circuit has noted, "[a] trial setting normally will provide the best operating environment for the triage which Daubert demands." Id.

(1) "keep the heating, ventilating and air conditioning, plumbing, electrical, and other mechanical systems in good operating condition"; and (2) "use all reasonable precaution to prevent deterioration" of the façade and mechanical systems. (Lease § 6, Ex. H to BOA's SUF, ECF No. 207-8.)  As noted above, the Termination Provision defines the scope of these obligations.  "Good operating condition" means BOA had to ensure that the electrical, ventilation, and air conditioning systems performed at the same level of operation as they did at the start of the Lease, excepting ordinary wear and tear.  "All reasonable precaution to prevent deterioration" means precautions necessary to prevent the Building's façade and mechanical systems from deteriorating below the conditions they were in at the start of the Lease, excepting ordinary wear and tear.  (See id. § 18.)  And, again, questions of fact remain as to whether BOA met these obligations as to each system.

BOA's weakest argument involves the Building's façade.  It argues that because High Rock's expert did not opine as to the precise condition of the façade in 2003, BOA is entitled to summary judgment.  This argument, however, overlooks the record before the Court.  Most notably, the record contains two property condition assessments for the Building, one completed in March of 2003, the other in April 2003 - both just prior to the commencement of the Lease on April 17, 2003 - that detail

16

the condition of the façade.  (See Ex. I to BOA's SUF, ECF No. 207-9; Ex. J to BOA's SUF, ECF No. 207-10.)  While they noted some issues, such as spalling concrete (one described the spalling as "minor"), both concluded that the façade was in overall good to fair condition.  (See Ex. I to BOA's SUF § 3.3.3, ECF No. 207-9; Ex. J to BOA's SUF § 3.3, ECF No. 207-10.) This is in stark contrast to later reports describing the façade as suffering from "accelerated deterioration" and warning that BOA needed to initiate a permanent repair plan to prevent "potentially large-scale failures."  (Ex. LL to BOA's SUF WJE003784, ECF No. 209-21.)

Further, BOA's argument overlooks the fact that the façade consultants it hired during the course of the Lease recommended numerous repairs to the façade to prevent it from deteriorating. (See id. at WJE003785.)  BOA chose not to implement a number of these recommendations, and, according to BOA's own consultants, the façade continued to deteriorate over the course of the Lease.  (See id.; Waterston Dep. 61:16-23, 94:20-100:24, Ex. R to BOA's SUF, ECF No. 208-4.)  Based on this evidence, questions of fact exist as to whether BOA took "all reasonable precaution to prevent deterioration" of the façade, and whether BOA surrendered the Building with the façade "in as good condition and repair as when the Lease commenced, excepting ordinary wear and tear."

Though a closer call, questions of fact also persist as to whether BOA maintained the electrical and HVAC systems in "good operating condition" and took reasonable precautions to prevent their deterioration. Although the parties seem to agree that many of the systems' components had served beyond their expected life cycle at the start of the Lease, they hotly dispute whether (1) evidence exists as to the components' conditions in 2003, and (2) whether BOA adequately maintained the components during the course of the Lease. As to the first dispute, like with the façade, both of the property condition assessment reports conducted just before the Lease's commencement describe both systems as in relatively good condition. (Ex. I to BOA's SUF §§ 3.4.2, 3.4.3, ECF No. 207-9; Ex. J to BOA's SUF §§ 4.2, 4.3, ECF No. 207-10.) Consequently, evidence exists relating to the systems' condition at the start of the Lease.

And, again, questions of fact exist as to whether BOA properly maintained the systems over the course of the Lease. BOA points to the significant investments it made in the electrical and HVAC systems over the Lease term and the fact that neither system failed during the Lease to support its position that it adequately maintained both systems. High Rock counters by pointing to numerous documents from BOA and its property manager highlighting concerns over certain components' function and safety, BOA's plans to repair and replace certain

18

components, along with expert opinions regarding the systems' poor conditions at the end of the Lease. To be sure, the record is thin on whether these components' condition resulted from ordinary wear and tear, as opposed to BOA breaching is maintenance duties under the Lease. But, at least at this point, High Rock presents sufficient evidence to survive summary judgment. Questions of fact exist as to whether BOA kept the systems in good operating condition and took reasonable precautions to prevent the systems' deterioration.

### 3.   High Rock's Breach of Contract Damages

BOA also argues that it is entitled to summary judgment on High Rock's contract claims because High Rock cannot establish its damages with sufficient certainty. In support of this argument, BOA relies heavily on Ondine Shipping Corp. v. Cataldo, 24 F.3d 353 (1st Cir. 1994), for the proposition that in breach of contract actions plaintiffs must present evidence to support their claims for damages. (Def.'s Mem. 39, ECF No. 205-1.) There, the plaintiff "shot for the moon, seeking a $3,000,000 award on a theory of damages that had no foundation in Rhode Island law." Ondine, 24 F.3d at 357 n.1. Even the replacement cost of the item at issue, a racing ship, was valued at half that amount. Id. at 354. Consequently, the court held that plaintiff had not presented any cognizable claim to damages.

Here, contrary to BOA's assertions, High Rock's damages do not lack foundation in Rhode Island law. As detailed above, among other things, the Lease required BOA to maintain the Building as Class B office space. High Rock's expert opined that new systems would bring the Building up to this level and High Rock has submitted evidence outlining the costs of this work. Whether this accurately states BOA's obligations under the Lease is a question of fact for the jury, but High Rock has evidence to support the cost of these damages claims. Further, BOA's own internal reports during the course of the Lease evidence the cost of many of the repairs that High Rock now argues BOA should have carried out. High Rock, thus, has sufficient evidence to argue its damages with sufficient specificity at trial. BOA is not entitled to summary judgment on Count II.

B.   Implied Covenant of Good Faith and Fair Dealing Claim

The Court need not linger on BOA's arguments regarding High Rock's implied covenant of good faith and fair dealing claim. The Bank argues it is entitled to summary judgment on this claim for the same reasons BOA is entitled to summary judgment on High Rock's breach of contract claim. (See Def.'s Mem. 18, ECF No. 205-1.) As detailed above, High Rock's breach of contract claim will proceed to a jury. Since BOA provides no independent basis

for dismissing High Rock's implied covenant claim, it survives as well.

C.   Waste Claim

High Rock concedes that its waste claim only applies to the Building's façade; it argues that BOA's failure to implement the longer-term façade repairs outlined by BOA's façade consultants in 2006 caused damage that "no amount of repair can ever undo." (Pl.'s Opp'n 40, ECF No. 228.)   BOA counters by pointing to its efforts to preserve the façade and to admissions from High Rock's experts that the façade can be restored to a condition that is as good as new.   According to BOA, this means that it did not intentionally commit waste and that any damage to the façade is not permanent, both of which BOA argues are required elements of a waste claim in Rhode Island.   At least at this stage, BOA's argument fails.

Rhode Island has long "defined waste as 'the doing of those acts which cause lasting damage to the freehold or inheritance, or the neglect or omission to do those acts which are required to prevent lasting damage to the freehold or inheritance.'" Reniere v. Gerlach, 752 A.2d 480, 484 (R.I. 2000) (quoting Chapman v. Cooney, 57 A. 928, 929 (R.I. 1904) and noting that "[a]lthough almost a century has passed since the concept of waste was laid out in Chapman, we adhere to it today").   In determining whether "lasting damage" has occurred, courts must

21

consider "the particular facts and circumstances appearing in [a] case." Chapman, 57 A. at 929. This means courts must consider things like the age and condition of the building and the relation between the person charged to have committed the waste and the building. See id. But even severe damage does not amount to waste when it results from ordinary wear and tear. Id. Further, Rhode Island recognizes both voluntary and permissive waste, which means that an estate holder can commit waste through either intentional conduct or gross negligence. See id. (considering whether defendant was responsible for both voluntary and permissive waste and noting that no permissive waste occurred because respondent "has not been guilty of gross negligence").

Although waste requires lasting damage, BOA points to no authority suggesting that to sustain a waste claim, the damage must place the building beyond repair. To be sure, the damage must be severe; but as noted above, in deciding whether waste has occurred, courts must consider the "particular facts and circumstances" of a building. These facts and circumstances include the amount of repairs necessary to fix the alleged waste – or whether it can be fixed at all – as well as things like the condition of the building prior to a tenant assuming control of the building, the level of normal deterioration expected over time, and obligations a tenant assumes for a building during its

occupancy. Here, as detailed above, questions of fact exist as to the severity of the damage to the façade and the cause of the damage – i.e. whether it resulted from BOA's decisions not to undertake certain maintenance suggested by its consultants or due to ordinary wear and tear. For these reasons, BOA is not entitled to summary judgment on Count IV.

D. Holdover Tenancy Claim

High Rock's "holdover tenancy" claim stems from BOA's failure to remove a significant amount of furniture from the Building at the end of the Lease. In support of the claim, High Rock relies on Section 18 of the Lease, which provides in relevant part that

> [a]ll moveable furnishings, trade fixtures and other equipment and personal property owned by [BOA] may be removed from the Premises by [BOA], at [BOA]'s sole expense, no later than the date of termination . . . .

(Lease § 18, Ex. G to BOA's SUF, ECF No. 207-8.) High Rock asserts that BOA violated this Lease provision and remained in possession of the Building after the Lease officially ended because it left behind "thousands of file cabinets, desks, cubicles and other miscellaneous office furnishings," enough to fill 76 full-sized tractor trailers. (Compl. ¶¶ 120-122, ECF No. 1.) According to High Rock, BOA's failure to remove its furnishings implicated the Lease's holdover tenancy provision allowing it to recover 150% of the last base rent for each day

BOA remained in the Building.  (Pl.'s Opp'n 23-24, ECF No. 228.)
High Rock's argument is without merit.

The plain language of the Lease is unambiguous.  It
provides that BOA <u>may</u> remove all moveable furnishings from the
Building prior to the Lease's termination; but it does not
require BOA to do so.  Under Rhode Island law, generally, "the
use of the word 'may' rather than the word 'shall' indicates a
discretionary rather than a mandatory provision."  <u>Quality Ct.
Condo Ass'n v. Quality Hill Dev. Corp.</u>, 641 A.2d 746, 751 (R.I.
1994); <u>see also</u> <u>Downey v. Carcieri</u>, 996 A.2d 1144, 1151 (R.I.
2010).  In its brief, High Rock presented no authority or
argument to suggest that the Court should digress from this
regular rule of construction.  The plain language of the Lease
gave BOA discretion to leave the furnishings in the Building and
in exercising this discretion, BOA did not become a holdover
tenant.  For this reason, BOA is entitled to summary judgment on
Count V.[9]

_____

    [9]  High Rock's only reference to its holdover tenancy claim
in its summary judgment briefing came in its "Facts" section,
where it recounted the facts that give rise to the claim.  High
Rock did not present any argument or cite to any authority that
demonstrate its facts are sufficient to allow the claim to
proceed.  Thus, BOA is likely correct that High Rock waived this
claim.
    Perhaps recognizing its error, at oral argument High Rock
advanced a new theory as to why the holdover tenancy claim
should survive:  because, as used in the Lease, the term "may"
indicates a mandatory, as opposed to a discretionary action.  In
support, High Rock directed the Court to <u>In re Ionosphere Clubs</u>,

E.   Lost Rental Income Claim

At oral argument, High Rock conceded that it was abandoning its lost rental income claim.   Consequently, BOA is entitled summary judgment on Count VI.

F.   Asbestos Claim

Finally, High Rock has moved to amend its Complaint to add a claim that BOA breached the Lease by not removing friable asbestos from the Building.   According to High Rock, BOA's action breached Paragraph 27 of the Lease, which High Rock claims obligated BOA to indemnify it for removing the substance from the Building.   At oral argument, High Rock conceded that it did not plead this claim in its Complaint.   (Summ. J. Hr'g Tr. 9:13-16, ECF No. 251.)   Nevertheless, High Rock argues it should be allowed to amend its Complaint - even at this late stage – because its discovery requests put BOA on notice that it intended to raise such a claim.   High Rock's arguments fail.

---

111 B.R. 436 (S.D.N.Y. 1990).   The Court declines to consider this case.   First, it need not consider a new argument presented for the first time at oral argument.   See U.S. ex rel. Dyer v. Raytheon Co., No. CIV.A. 08-10341-DPW, 2013 WL 5348571, at *25 (D. Mass. Sept. 23, 2013) ("As the First Circuit has held — albeit in the criminal context — 'except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived.'" (quoting United States v. Giggey, 551 F.3d 27, 36-37 (1st Cir. 2008)).   And, in any event, High Rock provides nothing to suggest that an out-of-district decision from a bankruptcy court should override the clear Rhode Island precedent cited above.

As detailed in Section II, above, although Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires," a District Court is within its discretion to deny a motion to amend where there is adequate reason, "e.g., undue delay, bad faith, dilatory motive on the part of the movant, futility of the amendment." N. Ins. Co. of New York v. Albin Mfg., Inc., No. CIV.A. 06-190-S, 2008 WL 2019365, at *1 (D.R.I. May 9, 2008) (quoting Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995)). Further, while as a general rule, delay by itself is insufficient to justify denying an amendment under Rule 15, long delays put "the burden upon the movant to show some 'valid reason for his neglect and delay.'" Tiernan v. Blyth, Eastman, Dillon & Co., 719 F.2d 1, 4 (1st Cir. 1983) (quoting Hayes v. New England Millwork Distributors, Inc., 602 F.2d 15, 20 (1st Cir.1979)); see also Nikitine, 715 F.3d at 390-91. Absent a valid reason, district courts are well within their discretion to deny an amendment. See id. Here, High Rock's delay in moving to amend was both lengthy and without justification.

First, as High Rock admits, it "inten[ded] to assert an asbestos claim since the beginning of discovery" (see Pl.'s Mot. to Am. Mem. 2, ECF No. 257), which commenced on November 14, 2013. (See Standard Pretrial Order, ECF No. 24.) High Rock, however, did not move to amend its Complaint until May 26, 2016.

This was over three years after BOA surrendered the Building to High Rock (and when High Rock ostensibly had the power to inspect the Building for asbestos) (see BOA SUF ¶ 114, ECF No. 206); two and half years after the start of discovery, and almost two years after BOA produced documents concerning asbestos in the Building (see Pl.'s Mot. to Am. Mem. 3, ECF No. 257); nineteen months after High Rock requested Rule 30(b)(6) testimony about asbestos (see id.); eight months after the Court set the parties' summary judgment briefing schedule (see Sept. 15, 2015 Text Briefing Schedule Order); four months after the parties completed briefing summary judgment (see Def.'s Reply, ECF No. 243); and two months after the Court expressly asked High Rock why it had not amended its Complaint during oral argument on BOA's Motion (see Summ. J. Hr'g Tr. 10:15-11:10, ECF No. 251). From this it is clear that at nearly every stage in this litigation, High Rock knew or should have known about the facts underlying its asbestos claim, but, by its own admission, waited at least two and half years to bring it. This is, perhaps, the definition of "undue delay."

Further, High Rock offers no justification for any of these delays. It does not, for example, argue that it uncovered the asbestos for the first time during discovery, something that could have "led to previously unknown facts which altered the shape of [its] case." Tiernan, 719 F.2d at 4. Instead, High

Rock merely argues that BOA will not be prejudiced by the tardy amendment because BOA should have known High Rock intended to bring an asbestos claim based on High Rock's discovery requests. As BOA points out in its Opposition, a number of courts have rejected this assertion. See, e.g., Media Sport & Arts s.r.l. v. Kinney Shoe Corp, No. 95 CIV. 3901 (PKL), 1999 WL 946354, at *4-5 (S.D.N.Y. Oct. 19, 1999) (noting that granting leave to amend "would not be appropriate" even though issue had "been the subject of considerable discovery"); Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 460, 461-62 (S.D.N.Y. 2007) (noting that "discovery was simply not adequate to put [the defendant] on notice" of a claim, and denying leave to amend).  And in any event, were the Court to grant High Rock's motion, at a minimum "both [BOA] and the [C]ourt would likely [require] additional time to prepare for trial.  'Given [High Rock's] failure to excuse in any way [its] delay in prosecuting [this] suit, [the Court] cannot describe this prejudice as insignificant.'" Tiernan, 719 F.2d at 5 (quoting Hayes, 602 F.2d at 20).  For these reasons, High Rock's Motion to Amend is denied.

IV.  Conclusion

For the foregoing reasons BOA's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Specifically, the Court

- DENIES BOA's Motion as to Count II (Breach of Contract), which shall proceed to a jury as to (1) whether BOA maintained the Building as Class B office space; and (2)

whether BOA maintained the Building's façade, electrical, and HVAC systems "good operating condition" and took reasonable precautions to prevent deterioration;

- DENIES BOA's Motion as to Count III (Implied Covenant of Good Faith and Fair Dealing);

- DENIES BOA's Motion as to Count IV (Waste);

- GRANTS BOA's Motion as to Count V (Holdover Tenancy);

- GRANTS BOA's Motion as to Count VI (Lost Rental Income).

The Court sua sponte grants High Rock summary judgment on Count I (Breach of Contract – Basement Switch Gear) because BOA concedes its liability on the claim.

High Rock's Motion to Amend the Complaint is DENIED.

The Court will schedule a conference in the near future to establish a trial date for this case.


IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  September 7, 2016